IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 3, 2025

IN RE ISABELLA P.

Appeal from the Chancery Court for Cannon County
No. A22-03          Terry A. Fann, Judge

_____

No. M2024-00991-COA-R3-PT

_____

In this case involving termination of the father's parental rights to his child, the Cannon County Chancery Court ("trial court") determined that clear and convincing evidence supported termination as to five statutory grounds: substantial non-compliance with a permanency plan, persistence of the conditions that led to the child's removal from the parents' custody, severe child abuse, incarceration of a parent for more than ten years when the child is under eight years of age, and failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the child. The trial court further determined that termination of the father's and mother's parental rights was in the child's best interest. The father has appealed. Upon review, we vacate the trial court's determination concerning the ground of substantial non-compliance with a permanency plan. In all other respects, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed in Part, Vacated in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which JEFFREY USMAN and VALERIE L. SMITH, JJ., joined.

Lacey N. Buchanan, Murfreesboro, Tennessee, for the appellant, Timothy P.

Gary D. Beasley, Murfreesboro, Tennessee, for the appellees, Benjamin P. and Angelica P.

**OPINION**

I. Factual and Procedural Background

This action concerns the "Petition for Adoption of a Related Child and Termination of Parental Rights" ("Termination Petition"), filed by Benjamin P. ("Foster Father") and Angelica P. ("Foster Mother") (collectively, "Petitioners") in the trial court on June 9, 2022.[1] Petitioners sought adoption of Foster Father's half-sister, Isabella P. ("the Child"), and termination of parental rights of the Child's biological parents, Samantha H. ("Mother") and Timothy P. ("Father").[2] The Child, born in June 2014, had been adjudicated dependent and neglected by order of the Cannon County Juvenile Court ("juvenile court") on December 23, 2019. In that order, the juvenile court had granted temporary custody of the Child to Foster Father, and the Child had resided with Petitioners from that time forward.

In the Termination Petition, Petitioners alleged the following grounds for termination against both parents: (1) abandonment, (2) substantial non-compliance with a permanency plan, (3) persistence of the conditions that led to the Child's removal from the parents' custody, (4) incarceration of a parent for more than two years for conduct against a child, (5) incarceration of a parent for more than ten years when the Child is under eight years of age, (6) severe child abuse, and (7) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. Petitioners also alleged that clear and convincing evidence demonstrated that termination of parental rights was in the Child's best interest.

Mother did not file an answer or other response to the Termination Petition; consequently, Petitioners filed a motion for default judgment against Mother, which the trial court granted on March 6, 2023. Father responded by sending three letters to the trial court, which the court construed as an answer to the Termination Petition. Because Father was incarcerated and indigent at the time the Termination Petition was filed, the trial court appointed counsel to represent Father in the termination proceedings.

The trial court conducted a hearing on March 11, 2024, during which it heard testimony from Father, Foster Father, and Foster Mother. Rebecca Lashbrook, the

---

[1] On January 12, 2024, Petitioners filed an amended petition by permission of the trial court, in which they added a paragraph providing notice that any appeal of the trial court's final disposition of the petition would be governed by Tennessee Rule of Appellate Procedure 8A. Because the amended petition did not include any additional grounds for termination, we determine that the amended petition was not a "separate and distinct petition" from the original Termination Petition. Accordingly, we will use the filing date of the original Termination Petition for purposes of determining the proper versions of the relevant statutes. *Cf. In re Leah T.*, No. M2022-00839-COA-R3-PT, 2023 WL 4131460, at *12-13 (Tenn. Ct. App. June 22, 2023) (citing *In re Liberty T.*, No. E2022-00307-COA-R3-PT, 2023 WL 2681897, at *10 (Tenn. Ct. App. Mar. 29, 2023) for the proposition that "when additional statutory grounds in support of termination [are] raised in an amended petition, the amended petition ha[s] to be considered separate and distinct from the original petition for the purpose of establishing its filing date[.]").

[2] Mother did not participate in the proceedings below and has not filed a brief on appeal. Therefore, this Opinion focuses solely on the trial court's termination of Father's parental rights.

Child's appointed guardian *ad litem* ("GAL"), was also present.  On June 10, 2024, the trial court entered an order terminating Mother's and Father's parental rights to the Child. In the order of termination, the trial court found that clear and convincing evidence supported termination of Mother's and Father's parental rights relative to the following grounds:  (1) substantial non-compliance with a permanency plan, (2) persistence of the conditions that led to the Child's removal from the parents' custody, (3) severe child abuse, (4) incarceration of a parent for more than ten years when the child is under eight years of age, and (5) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child.   The trial court additionally found, by clear and convincing evidence, that termination of parental rights was in the Child's best interest.  Father timely appealed.

## II.  Issues Presented

Father presents the following issues for our review, which we have restated slightly:

1.      Whether the trial court erred in finding, by clear and convincing evidence, that Petitioners had proven grounds for termination of Father's parental rights.

2.      Whether the trial court erred in finding, by clear and convincing evidence, that termination of Father's parental rights was in the Child's best interest.

## III.  Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).  The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530.  Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).  The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002).  It is well established, however, that "this right is not

absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).
>
> * * *
>
> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence,"

including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

The trial court determined that Petitioners had failed to prove the ground of abandonment by clear and convincing evidence, and Petitioners have not challenged that ruling on appeal. Although our Supreme Court has instructed that this Court "must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal," *see In re Carrington H.*, 483 S.W.3d at 525-26, we have not interpreted this instruction "to mean that this Court must also review grounds that the trial court found were not sufficiently proven when the party who sought termination does not challenge that ruling on appeal." *In Re Disnie P.*, No. E2022-00662-COA-R3-PT, 2023 WL 2396557, at *5 (Tenn. Ct. App. Mar. 8, 2023) (quoting *In re C.S.*, No. E2019-01657-COA-R3-PT, 2020 WL 2066247, at *3 (Tenn. Ct. App. Apr. 29, 2020)). Accordingly, we will not review the trial court's determination that the statutory ground of abandonment had not been proven by clear and convincing evidence. Additionally, the final order is silent concerning the alleged ground that Father was incarcerated for more than two years for severe child abuse. Petitioners have not presented an argument relative to this ground on appeal, and we therefore decline to address it for the same reasons that we decline to review the trial court's finding concerning the ground of abandonment. *See id.*

## IV. Statutory Grounds for Termination of Parental Rights

Tennessee Code Annotated § 36-1-113 (West July 1, 2021, to current)[3] lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c)     Termination of parental or guardianship rights must be based upon:

---

[3] Unless otherwise noted, throughout this Opinion, all citations to any section within Tennessee Code Annotated §§ 36-1-113 and 36-1-102 shall be made in reference to the version that was effective on the date the Termination Petition was filed and not to any other version of the statute. *See, e.g.*, *In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *4, n.6 (Tenn. Ct. App. Aug. 5, 2023). In some instances, such as this one, the subsection that was in effect at the time the Termination Petition was filed has not changed and therefore remains current.

- 5 -

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court concluded that the evidence clearly and convincingly supported five statutory grounds to terminate Father's parental rights:  (1) substantial non-compliance with a permanency plan, (2) persistence of the conditions that led to the Child's removal from the parents' custody, (3) severe child abuse, (4) incarceration of a parent for more than ten years when the child is under eight years of age, and (5) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child.   We will address each statutory ground in turn.

A.  Substantial Noncompliance With a Permanency Plan

Concerning this ground, Tennessee Code Annotated § 36-1-113(g)(2) provides for termination of parental rights when

[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4[.]

The Tennessee Supreme Court has described the requirements for finding this ground as follows:

Substantial noncompliance is a question of law which we review de novo with no presumption of correctness.  Substantial noncompliance is not defined in the termination statute.  The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial.  Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." *Black's Law Dictionary* 1428 (6th ed. 1990).  In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement.  Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant.

*In re Valentine*, 79 S.W.3d 539, 549 (Tenn. 2002); *In re Carrington H.*, 483 S.W.3d at 537 ("A parent's rights may be terminated for her substantial noncompliance with the responsibilities contained in a permanency plan . . . so long as the plan requirements are

- 6 -

reasonable and related to remedying the conditions which necessitate[d] foster care placement.") (citations and internal quotation marks omitted).

Here, the trial court determined that this ground had been established by clear and convincing evidence as follows:

> The next ground alleged at trial is that there has been substantial noncompliance by a parent or guardian with the statement of responsibilities in the permanency plan. The petitioners point the Court to Exhibit 1, the adjudicatory and dispositional hearing order for temporary custody by the Juvenile Court of Cannon County. There was a no-contact order in that dispositional hearing order. However, the Court finds that there is no evidence of compliance with any of the conditions of that order. The Court finds that neither the mother nor the father took any action to try to set aside the no-contact portion of the order or to ask their counsel, which they both had at that time, to find some means through a motion or otherwise to allow contact. The Court finds by clear and convincing evidence that there was substantial noncompliance by both respondents to that permanency plan.

(Paragraph numbering omitted.) The juvenile court order to which the trial court referred as "Exhibit 1" was entered on December 23, 2019. In that order, the juvenile court had determined that the Child was dependent and neglected, that the Child had been the victim of severe child abuse, and that removal of the Child from the parents' custody was in the Child's best interest. The juvenile court had concluded by ordering the following:

> [Foster Father and Foster Mother shall] retain custody of [the Child], along with the authority to consent to necessary medical, surgical, hospital, institutional care, or educational enrollment, pending further Order of this Court.
>
> There is to be no contact, direct or indirect, between [Mother], [Father] and [the Child], unless/until this Court orders otherwise.
>
> Prior to changing the custodial or visitation arrangement, the child's counselor will need to determine it is in the child's best interests. [I]n doing so, the counselor will need to take into account any psychological or psychosexual evaluations completed on the parents, including the psychosexual evaluation completed on [Mother].

(Paragraph numbering omitted.) Aside from the instructions contained in the juvenile court's December 23, 2019 order, there is no permanency plan or other similar instructional document in the record before us.

The trial court erred in finding this ground had been established by clear and convincing evidence because the record contains no permanency plan as contemplated by § 36-1-113(g)(2). Tennessee Code Annotated § 37-2-402(9) defines "plan" or "permanency plan" as a "written plan for a child placed in foster care with the department of children's services [("DCS")] or in the care of an agency as defined in subdivision (3) [defining "agency" as a "child care agency"] and as provided in § 37-2-403[.]" Section 37-2-403 provides detailed instructions for an agency to follow in preparing a permanency plan, including that the agency should determine a goal for the child's future permanent living arrangement and should facilitate the formation of a "statement of responsibilities between the parents, the agency and the casework of such agency." *See* Tenn. Code Ann. § 37-2-403(2)(A). The statute specifically instructs that "[s]ubstantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights[.]" *See* Tenn. Code Ann. § 37-2-403(2)(C) (emphasis added).

Upon review, we determine that Father cannot be found to have failed to substantially comply with a permanency plan when no such plan was formulated in the first instance. The record before us contains no evidence that the Child was ever in DCS custody or in the care of another agency at any time. There is also nothing in the record resembling a permanency plan or a parent's "statement of responsibilities" such as is described in § 37-2-403. In finding this ground had been established, the trial court referred only to the December 23, 2019 juvenile court order directing that neither parent could have contact with the Child. By statutory definition, the juvenile court order was not a permanency plan. Father cannot have failed to comply with a permanency plan that never existed. Accordingly, we vacate the trial court's determination that Petitioners had established, by clear and convincing evidence, the ground of substantial noncompliance with a permanency plan concerning Father.

B. Persistence of Conditions Leading to the Child's Removal

The trial court next determined that the statutory ground of persistence of the conditions leading to removal of the Child from Father's custody had been proven by clear and convincing evidence. The version of Tennessee Code Annotated § 36-1-113(g)(3) (West July 1, 2021, to June 30, 2022) in effect when the Termination Petition was filed provided the following additional ground for termination of parental rights:

(A)     The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

- 8 -

(i)    The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii)   There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii)  The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B)    The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

In the instant case, the trial court summarized its findings regarding this statutory ground as follows:

The Court finds that the petitioners have proved by clear and convincing evidence this ground. There is testimony by [Father] that he has asked for a pardon, but there's no proof of that request. There is proof in this record that he is serving eighty-five (85) percent of a twelve (12) year sentence and his release date is not going to be for at least another four years. The Court finds that the petitioners have met their burden by clear and convincing evidence for each one of these factors. The mother has presented no evidence that there's any means of a safe return of care to her and it is the same for the father. The father is incarcerated. He will not be released for at least four years. And there is no proof that in the event he was released or when he is released, that the evidence of the neglect of this child will have been cured. There is no parent-child relationship and has not been since 2018 between the mother, the father, and this child. The Court finds that this ground has been established by clear and convincing evidence.

Upon review, we determine that a preponderance of the evidence supports the trial court's determination that the conditions that led to the Child's removal from Father's custody persisted. Father had been incarcerated in April 2018 and had remained incarcerated throughout the termination proceedings. In December 2019, the juvenile court had determined that the Child was dependent and neglected. Both parents had expressly stipulated to the juvenile court's findings of fact, "with the understanding that

- 9 -

the [C]hild [had been] the victim of severe child abuse." The facts stipulated to included that the parents' residence they had shared with the Child had been found in a "deplorable condition"; that there were "dirty clothes, dishes, and molded food" present in the home; and that the "trailer was infested with rats." Father corroborated these facts in his testimony before the trial court in 2024.

At the time of the termination hearing in March 2024, the Child had been in Petitioners' custody for thirty-nine months by court order, far longer than the statutory six-month minimum. Father had remained incarcerated, serving a twelve-year sentence after being convicted of two counts of sexual exploitation of a minor. In the intervening months, there was no evidence that Father had taken responsibility for his criminal actions, taken steps to regain contact with the Child or improve his parenting skills, or shown any interest in the Child's well-being. Father was not eligible to be released from prison for at least four years from the date of the termination hearing and therefore would be unable to provide a suitable home for the Child during that time. We therefore affirm the trial court's determination that clear and convincing evidence supported this ground for termination of Father's parental rights to the Child.

C. Severe Child Abuse

The trial court concluded that the evidence clearly and convincingly demonstrated that Father had committed severe child abuse against the Child. Tennessee Code Annotated § 36-1-113(g)(4) provides that this ground has been proven when:

> The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

At the time the Termination Petition was filed, Tennessee Code Annotated § 37-1-102(b)(27) (West July 1, 2021, to June 30, 2022) defined "severe child abuse," in pertinent part, as:

> (A)  (i)  The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;
>
>      (ii)  "Serious bodily injury" shall have the same meaning given in § 39-15-402(c);

- 10 -

(B)        Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct[.]

Concerning this ground, the trial court adopted the findings of fact from the juvenile court's December 23, 2019 order and determined that those findings established by clear and convincing evidence that the Child had suffered severe child abuse. First, the trial court stated that both Father and Mother had "consented" to the juvenile court's determination that the child had been "the victim of severe child abuse pursuant to T.C.A. § 37-1-102(b)(27) perpetrated by [Mother] and [Father]." The trial court further noted that there had been "no action taken [by the parents] to try to offset or diminish" the juvenile court's ruling. The juvenile court order included the following relevant factual findings relative to this ground:

> *The Tennessee Department of Children's Services received a referral in regards to [the Child] on April 3, 2018 alleging Environmental Neglect and Lack of Supervision. The referral also referenced concerns of the child's father engaging in child pornography and the mother's knowledge of this.*
>
> *Child Protective Services Investigator Shelley Smith was assigned the referral and began the investigation. Investigator Brandon Gullett obtained a search warrant on April 5, 2018. On that date, CPSI Shelley Smith, Investigator Brandon Gullett, and other law enforcement officers went to [the residence the parents shared with the Child], where contact was made with [Mother] and [Father]. The family has been residing in a camper trailer on this property for approximately 3 years. The residence was in deplorable condition. When CPSI Smith entered the trailer, she was overwhelmed with the odor of the residence to the point it was difficult to breathe. CPSI Smith observed dirty clothes, dishes, and molded food. The trailer floor was covered with a multitude of things including trash, clothes, toys, etc. There was a gun in the living room area that was accessible to [the Child]. The trailer was infested with rats and there was water damage from the pipes bursting. According to the family, the pipes burst in the winter of 2017 and the family has not had any running water since then.*
>
> *The trailer has a twin size bed that is covered with items and is not used for sleeping. There is a full size bed where [Mother] stated that she,*

- 11 -

*[Father], and [the Child] all slept nude. [Mother] stated that they want to teach [the Child] that it is ok to be naked as long as they are not going out or anyone is coming over.*

*[Mother] stated that she has been in a relationship with [Father] since she was 19 years old and he is 23 years her senior. [Mother] stated that she was aware that [Father] was interested in child pornography when she met him but she thought having a child with him would stop that. [Mother] stated that she has seen images of child pornography that [Father] has saved to devices. [Mother] also stated that she has seen him watch pornography ranging from adult porn, child porn, bestiality porn, and "skat" porn often. [Mother] stated that she has been working at Nissan and she is unaware of what goes on when she is at work. According to [Mother], [Father] drives her to work and picks her up. Also according to [Mother], [Father] keeps [the Child] when she is at work, she does not know what happens when she is gone and she does not ask what he does with [the Child].*

*[Mother] stated that she laid [the Child] down the night before, April 4, 2018, examined her vagina, and her hymen appeared to be intact to her so she "do[es not] think anything physical has been done with [the Child]."*

*A pair of g-string underwear was found in the residence tied in knots, appearing to have been modified to fit a child or small adult. Lingerie was also found that was notably too small to be [Mother's]. [Mother] stated that she is unsure of how the underwear got tied like that, and [the Child] is left unsupervised a lot and could have done it herself.*

*\* \* \**

*On April 5, 2018 during an interview with Investigator Gullet, [Mother] disclosed that [Father] would look up images of child pornography and save them to the hard drive of his laptop or tablet. The child had access to, and has used the devices. [Mother] stated she wanted to handle the situation on her own and did not want [to] get law enforcement involved. [Mother] said that the day prior, [Father] had sent her a message to destroy the devices before the cops came. When she came home from work things were moved from where they were kept. A laptop was taken out to a storage building and placed in a tote and she brought it back into the residence.*

*The family previously resided in Indiana. [Mother] stated that when she, [Father], and [the Child] lived in Indiana, Child Protective Services was involved due to environmental neglect issues, but they dismissed things to allow the family to move to Tennessee. [Mother] also stated that while living in Indiana there were neighbor girls that would spend the night with them and [Father] wanted them ([Father] and [Mother]) to engage in sexual activity with one of the children who was 15 years old. They solicited the child, who declined. [Mother] stated they have attempted to bring those children down to Tennessee to visit with them.*

*[Mother] stated it was troubling that [Father's] uncle and grandfather were pedophiles, and [Father] cannot keep himself from watching child pornography.*

*\* \* \**

*On April 5, 2018, [Mother] and [Father] were arrested for child neglect.*

The juvenile court had also incorporated into this order two judgments evincing that Father had been convicted of two counts of "sexual exploitation of a minor" pursuant to Tennessee Code Annotated § 39-17-1003. The felony sentences had been enhanced due to Father's possession of "over 100 images" of child pornography. Both judgments indicated that Father had pled "guilty" to the charges. Additionally, Father had been placed on the sex offender registry as a result of these criminal judgments.

In his appellate brief, Father avers that the trial court erred in finding that clear and convincing evidence supported this ground for termination. According to Father, he "did not admit or deny the allegations of severe abuse that were brought up at trial" but instead had continued to "claim to innocence of such crimes." Father also asserts that he had made "attempts to have his charges pardoned." However, despite Father's claims of innocence, the criminal judgments indicate, by check mark, that Father pled guilty to both counts of sexual exploitation of a minor. Additionally, the December 23, 2019 juvenile court order clearly states that Father, by counsel, stipulated to the juvenile court's factual findings concerning the allegation of severe child abuse:

Attorney for [Father] spoke with him on December 21, 2019 and announced the following agreement: [Father] neither admits nor denies the truth of the allegations but stipulates the child is dependent and neglected and stipulates to the Court adopting the facts in the petition as its findings of fact, with the understanding that the child is the victim of severe child abuse.

Father did not appeal the juvenile court order or the criminal judgments.

These facts constitute clear and convincing evidence supporting termination of Father's parental rights on the ground of severe child abuse. *See In re Austin S.*, No. E2022-01277-COA-R3-PT, 2023 WL 5970725, at *8 (Tenn. Ct. App. Sept. 14, 2023) ("[A] prior final order finding that a parent committed severe child abuse *alone* is sufficient grounds for parental termination under section 36-1-113(g)(4)."); *see, e.g.*, *In re Eli S.*, No. M2019-00974-COA-R3-PT, 2020 WL 1814895, at *9 (Tenn. Ct. App. Apr. 9, 2020) (finding the ground of severe child abuse had been established by clear and convincing evidence when the mother had waived an adjudicatory hearing and stipulated to a finding of severe child abuse during the dependency and neglect proceedings). We therefore affirm the trial court's determination as to this statutory ground.

### D. Parent Sentenced to Imprisonment for at Least Ten Years When the Child is Less than Eight Years Old

The trial court found that Father had been sentenced to twelve years in prison on two counts of exploitation of a minor when the Child was less than eight years old and concluded that these facts supported a separate, additional ground for termination. When the Termination Petition was filed in June 2022, the statute concerning this ground provided for termination of parental rights when

> [t]he parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court[.]

Tenn. Code Ann. § 36-1-113(g)(6) (West July 1, 2021 to June 30, 2022). The trial court determined:

> The Court considers as the next ground for termination of these parental rights that [Father] has been confined in a correctional or detention facility of any type by order of Court as a result of a criminal act under a 10-or-more-year sentence and the child is under the age of eight at the time of the sentence is entered by the Court. The Court finds that ground has been proven by clear and convincing evidence. Exhibits 2 and 3 are judgments in which [Father] entered pleas to sexual exploitation of a minor both being Class B felonies; both to which he was sentenced to the maximum range for a Class B felony, being 12 years; both of which require him to serve, as stated on the documents, a release eligibility of one hundred (100) percent. The statute allows a release under certain circumstances after eighty-five (85) percent. The Court understands that [Father] has not accepted responsibility for his conduct and points out to the

- 14 -

Court that the document indicates he entered a *nolo contendere* plea. The documents also indicate and show that he entered a guilty plea. The criminal court for Cannon County accepted his plea as a guilty plea and this Court acknowledges that those documents and his testimony concur that he entered a guilty plea for which he is serving a 12-year sentence. The Court also finds that at the time of the imposition of the sentence that this child was under the age of eight at the time. The Court finds by clear and convincing evidence that as to [Father], that ground has been proven for termination of his parental rights.

(Paragraph numbering omitted.)

On appeal, Father reiterates that he entered a "nolo contedere plea" relative to his criminal convictions and "could potentially have this pardoned or only serve it at 85%." Father asserts that if he is pardoned, he "will not serve 10 or more years of his sentence and this ground would not apply." Father does not provide legal authority to support this argument, and there is nothing in the record before us to suggest that Father was eligible to be pardoned or released early.

Even if Father had shown that he was eligible for an early release date or pardon resulting in an incarceration period of less than ten years, we are unpersuaded by Father's argument that this ground for termination does not apply to him. The plain language of the statute concerning this ground relates to the length of the criminal sentence, rather than to the actual time served in prison. *See* Tenn. Code Ann. § 36-1-113(g)(6) (providing for termination of parental rights when "[t]he parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years . . . .") (emphasis added).

On July 18, 2019, Father was convicted of two counts of sexual exploitation of a minor and sentenced to twelve years in prison. The record demonstrates that the Child was under eight years old on that date. Because the statutory requirements had been met, *see* Tenn. Code Ann. § 36-1-113(g)(6), we affirm the trial court's determination, by clear and convincing evidence, that Father's parental rights should be terminated because Father had been sentenced to prison for more than ten years when the Child was under eight years old.

E. Failure to Manifest an Ability and Willingness to Assume
Legal and Physical Custody of or Financial Responsibility for the Child

The trial court also determined that Father had failed to manifest an ability and willingness to assume custody of or financial responsibility for the Child. Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) provides for termination when:

- 15 -

[a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

To prove this ground, Petitioners were required to show, by clear and convincing evidence, that (1) Father failed to manifest either an ability or willingness to assume custody of or financial responsibility for the Child and (2) returning the Child to Father's custody would pose a risk of substantial harm to the Child's welfare. *In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *6 (Tenn. Ct. App. Apr. 23, 2020) ("Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.").

As to the first prong, our Supreme Court has instructed:

[S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*In re Neveah M.*, 614 S.W.3d at 677 (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). Concerning the "substantial harm" requirement of the second prong, this Court has observed:

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted in *Maya R.*)).

Here, the trial court determined the following relevant to this ground:

- 16 -

These parents, the evidence shows, have done nothing in this case on behalf of this child since they were both arrested and charged in the Circuit Court of Cannon County. The Court finds they have failed to provide financial support. They have failed to come to the Court through counsel or even *pro se* to request the opportunity and willingness to obtain custody, to provide financial responsibility, and based upon . . . the facts as the Court has taken them today regarding the father, it is the opinion of this Court that [the Child] should not return to these parents as it would pose a substantial risk of harm to her. The petitioners have proved this ground by clear and convincing evidence.

(Paragraph numbering omitted.)

We agree with the trial court that this ground had been established by clear and convincing evidence. By the time of trial, Father had demonstrated no interest in assuming financial responsibility for the Child and had not attempted to regain contact with the Child through self-improvement, reaching out to the Child's caretakers to inquire as to the Child's well-being, or seeking rescission of the juvenile court's no-contact order. On the contrary, Petitioners presented evidence that Father had sent threatening letters to Petitioners concerning their assumption of custody of the Child. Father's letters demonstrate Father's pattern of blaming everyone but himself, including his own attorneys, for his circumstances. Father's unwillingness to take steps to provide financial support for the Child, his inability to provide the Child a safe home due to his incarceration, his volatile communications with Petitioners, and his refusal to take responsibility for his use of child pornography are sufficient to establish the first prong of this ground. *See In re Neveah M.*, 614 S.W.3d at 677. Additionally, Father was incarcerated during trial such that Father was not able to assume physical custody of the Child even had he demonstrated an interest in doing so.

The above evidence also supports the trial court's determination that returning the Child to Father's custody would pose a substantial risk of harm to the Child. Considered together, Father's continued incarceration and his refusal to take responsibility for his admitted use of child pornography posed a "real hazard or danger" to the Child that we find significant. *See In re Maya R.*, 2018 WL 1629930, at *8. Moreover, at the time of the termination hearing in 2024, the Child had not resided with or had contact with either Father or Mother for over five years. Testimony revealed that in the intervening years, the Child had bonded with Petitioners and their children. This Court has previously determined that removing a child who has "bonded and thrived" with her current family amounts to substantial harm. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020) (determining that the child would be at risk of substantial psychological harm if custody were restored to the father who had been apart from the child for five years and was a "virtual stranger"); *In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25,

2019) (concluding that placing the children in the mother's custody would put them at risk of substantial harm because the children were "very young" when they were removed and had "little to no contact" with the mother for more than a year). We determine that the Child would likely suffer substantial harm if removed from the care of Petitioners, with whom she has resided for years and created an enduring bond. For the above-stated reasons, we affirm the trial court's determination that this statutory ground had been established by clear and convincing evidence.

## V. Best Interest of the Child

When, as here, a parent has been deemed unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i)(1) (West July 1, 2021, to current) lists the following factors for consideration:

(A)     The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)     Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

- 18 -

(D)     Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)     Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)     Whether the child is fearful of living in the parent's home;

(G)     Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)     Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statute further provides: "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(g)(i)(2).

As our Supreme Court has instructed regarding the best interest analysis:

These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that

termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

Here, the trial court considered each of the best interest factors and determined that several of them weighed in favor of terminating Father's parental rights. Upon careful review, we determine that the trial court's findings regarding the best interest factors are supported by a preponderance of the evidence.

Factors (A) through (E) concern, respectively, the effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority; the effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition; whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs; whether the parent and

child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment; and whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child.

The trial court determined that factors (A) through (E) weighed in favor of termination because Father was unable to provide stability and continuity for the Child. Specifically, the trial court noted that there had been "no contact between [the Child] and either parent since April of 2018" such that Father had "not been a part of [the Child's] life in any means whatsoever." The trial court determined that Father remained "incarcerated based upon his own decisions," which had "manifested themselves into two guilty pleas." The trial court further found that neither parent had "asked for any type of visitation or contact with the [Child] since removal" and neither had "sent gifts, cards, birthday cards, Christmas cards, or any type of support" or "reached out in any way to develop any type of relationship" with the Child. By contrast, the trial court observed that in Petitioners' care, the Child's "emotional and psychological and medical condition have all improved" since removal.

Upon careful review, we agree with the trial court's determination as to factors (A) through (E). Father had been incarcerated since the Child was removed from his home in 2018, and the Child had lived with Petitioners from that time with no contact from either Father or Mother. Father, through his attorney, had stipulated to the juvenile court's findings in 2019, including, *inter alia*, that Father had kept a gun and child pornography within access of the Child and that the trailer where he and Mother lived with the Child had been found by DCS workers to be in a "deplorable" condition. At trial, Father again admitted that the trailer where he had lived with the Child had been rat infested and had "water damage" "from the "rats trying to go through the little holes around the water piping." After the Child was removed from Father's custody, Father never financially supported the Child or attempted to regain contact with or take steps to initiate visitation with the Child. By contrast, the Child had been developing a bond with Petitioners and their family, had been attending school with Petitioners' children, and appeared to be thriving in their care. In sum, the evidence preponderates in favor of the trial court's determination, by clear and convincing evidence, that factors (A) through (E) weigh in favor of termination.

The trial court determined that there was no proof respective of factors (F) and (G) concerning whether the child is fearful of living in the parent's home and whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms. The trial court did not expressly state whether it weighed factors (F) and (G) neutrally or against termination. However, this Court has previously determined that when the only evidence regarding factors (F) and (G) supports a lack of fear and trauma, the factors weigh against termination of parental rights. *See In re Layton S.*, No. W2024-00973-COA-R3-PT, 2025

WL 1088253, at *18 (Tenn. Ct. App. Apr. 11, 2025) (concluding that factors (F) and (G) weighed against termination when the trial court had made no findings as to the factors, the mother had "offered testimony indicating the Child's lack of fear and trauma," and the petitioners had "failed to introduce countervailing evidence as to these factors"); *see generally In re Colten B.*, No. E2024-00653-COA-R3-PT, 2025 WL 252663, at *9-10 (Tenn. Ct. App. Jan. 21, 2025) (examining the applicability of factors (F) and (G) when the child has never lived in the parent's home or when no evidence concerning the factors has been presented at trial).

Here, there was no testimony at trial or any other evidence presented that the Child was fearful of living in the home with Father. When asked to describe a "typical day in the life" between himself and the Child, Father testified that he and the Child would "sit and watch YouTubes of things that she liked to watch," that "there was educational stuff that [the Child] would do on her tablet," that he and the Child would "sing together," and that the Child would accompany Father to drive Mother to and from work. We find nothing in Father's testimony to suggest that the Child feared Father or that she feared living in the parents' home with Father. Furthermore, the record contains no countervailing testimony that would suggest any trepidation on the Child's part vis a vis Father. We therefore conclude that in the instant case, factors (F) and (G) weigh against termination of Father's parental rights. *See In re Layton S.*, 2025 WL 1088253, at *18.

Factor (H) concerns whether the child has developed healthy parental attachments with another person in the absence of a parent. The trial court weighed this factor in favor of termination. Testimony at trial supported this finding, with both Foster Mother and Foster Father stating that the Child had bonded with each of them and with their biological children, that the Child had been attending and enjoying church with Petitioners, and that the Child was attending school along with the Petitioners' other children in Petitioners' home. Factor (H) weighs in favor of termination.

Concerning factor (I)—whether a child has emotionally significant relationships with persons other than the parents that would likely impact the child's relationships and access to her family heritage—the trial court weighed this factor in favor of termination, noting that Foster Father is the Child's biological half-brother through Father and that Foster Father was therefore able to provide "insight into [Father's] family." In considering this ground, we are cognizant of Foster Father's testimony that for several years, Foster Father had not had contact with some members of Father's family due to estrangement surrounding the custody battle for the Child. Despite this estrangement, we agree with the trial court that this factor weighs in favor of termination of Father's parental rights to the Child. Although Petitioners did not enjoy a good relationship with some members of Father's extended family at the time of trial, Foster Father did exhibit knowledge of the Child's family heritage. In addition, the Child had been developing a positive relationship with Petitioners and their children, as well as other extended family members who were close to Petitioners and also biologically related to the Child.

- 23 -

The trial court determined that factor (J)—whether the parent has demonstrated a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the parent's home—weighed in favor of termination. The court stated that Father had been convicted of "two very serious felonies" and that Father had not "accepted responsibility" for these criminal acts. The court noted that neither parent had a home and that Father remained incarcerated, rendering it impossible for Father to provide a safe home for the Child. The trial court reiterated that the record contained no proof that Father had tried to "adjust" or "take on any positive conduct to be a father" and had not attempted to maintain contact with the Child. Upon review, we agree.

The record contains no indication that Father had attempted to adjust his circumstances or conduct, and indeed, Father had remained incarcerated throughout the termination proceedings with no prospect for release in the immediate future. There was a dearth of evidence that Father had availed himself of any services or classes while incarcerated, and Father admitted that he had never attempted to regain contact with the Child. The evidence preponderates in favor of the trial court's determination as to factor (J). For the same reasons, we also affirm the trial court's decision to weigh factors (K)—whether the parent has taken advantage of available programs, services, or community resources to make a lasting adjustment of circumstances—and (M)—whether the parent has demonstrated a sense of urgency in seeking custody of the child—in favor of termination of Father's parental rights.

The trial court concluded that factor (L)—whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department—was inapplicable. We agree. Because the Child was never in protective custody with DCS prior to or during the termination proceedings, we find that factor (L) is inapplicable.

Factor (N) concerns whether the parent has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult. The trial court determined that Father's guilty pleas to two counts of sexual exploitation of a minor were sufficient to find that this ground weighed in favor of termination, and we will not disturb that finding.

The trial court next weighed factor (O)—whether the parent has ever provided safe and stable care for the child or any other child—in favor of termination. In support, the court referenced proof that Father and Mother had been "under investigation on a referral by DCS in Indiana" before moving to Tennessee. Foster Father testified that the Indiana investigation was related to an "environmental neglect" case involving Father, Mother, the Child, and certain other family members who had been living with Father and Mother at the time. While the Indiana investigation ensued, Foster Father had offered a "fifth-wheel camper" on his land in Tennessee to Father and Mother. According to Foster

Father, the parents had moved to the camper with the Child in "2015 in the fall" when the Child was "just over a year old." Foster Father explained that due to Foster Father's intervention and "support" for the Child and the parents at that time, the case in Indiana against Father and Mother had been dismissed.

Foster Father further testified that after Father and Mother moved to the camper on Foster Father's land in Tennessee, the environmental problems in Father's and Mother's home persisted such that the situation "ended up being a constant battle of asking [Mother and Father] to take care of the environment that [the Child] was in." Foster Mother corroborated that the Child had suffered "neglect" "while she was living in the trailer" with Father and Mother. This evidence, together with the proof that Father had been incarcerated since April 2018 and had been convicted on two counts of exploitation of a minor, clearly and convincingly demonstrates that Father had not ever provided safe and stable care for the Child or any other child.

For the same reasons that factor (O) weighs in favor of termination, factor (Q)—whether the parent has demonstrated the ability and commitment to create and maintain a home that meets the child's basic needs and in which the child can thrive—and factor (R)—whether the physical environment of the parents' home is healthy and safe for the child—also weigh in favor of termination of Father's parental rights to the Child.

As to factor (P)—whether the parent has demonstrated an understanding of the basic and specific needs required for the child to survive—the trial court relied upon the factual findings of the juvenile court "as to the rats in the house and the [C]hild being unsupervised" to find that this factor weighed in favor of termination. Significantly, during the termination proceedings, Father did not acknowledge or address any specific needs of the Child and did not demonstrate any interest in meeting the Child's needs or in knowing any details about the Child. Father did mention that the Child appeared "intelligent" and that he would do "educational stuff" with her on her "tablet" while she was still in his custody. However, without more, this evidence does not preponderate against the trial court's determination as to factor (P).

The trial court found by clear and convincing evidence that factor (S), which asks whether the parent has consistently provided more than token financial support for the child, weighed in favor of termination. The evidence demonstrated that Father had provided no financial support for the Child since his incarceration in 2018, four years before Petitioners filed the Termination Petition. The trial court then considered factor (T), concerning whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from providing safe and stable care for the child. The trial court weighed this factor in favor of termination based upon the proof that Father had pled guilty in 2019 to two counts of sexual exploitation of a minor. The criminal judgments in the record, together with Father's demonstrated unwillingness to

assume responsibility for those criminal acts, support the trial court's findings as to factor (T).

For the above-stated reasons, we affirm the trial court's conclusion that clear and convincing evidence established that termination of Father's parental rights was in the best interest of the Child.

## VI.  Conclusion

For the foregoing reasons, we vacate the trial court's determination that Father had failed to substantially comply with a permanency plan and that this presented a separate ground for termination of Father's parental rights to the Child.  We affirm the trial court's judgment in all other respects, including the court's termination of Father's parental rights.  This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Father's parental rights to the Child and for collection of costs assessed below.  Costs on appeal are assessed to the appellant, Timothy P.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE